

# COURT OF APPEALS
### SECOND DISTRICT OF TEXAS
### FORT WORTH

## NO. 2-08-333-CR

ROBERT SCOTT, JR.                                                                              APPELLANT

V.

THE STATE OF TEXAS                                                                                  STATE

------------

FROM THE 158TH DISTRICT COURT OF DENTON COUNTY

------------

## MEMORANDUM OPINION[1]

------------

### I. Introduction

In three issues, Appellant Robert Scott, Jr. complains that: (1) there was

no independent corroborating evidence to support accomplice testimony; (2) the

testimony of extraneous acts was admitted in violation of Scott's rights; and

---

[1] *See* Tex. R. App. P. 47.4.

(3) hearsay statements of a confidential source were admitted in violation of *Crawford v. Washington*.[2] We affirm.

## II.  Factual and Procedural History

This case involves a "reverse buy"[3] set up by the Denton County Sheriff's Office using a Drug Enforcement Administration (DEA) confidential informant. Scott pleaded not guilty to attempted possession of a controlled substance in an amount over 400 grams and of illegal barter, expenditure, or investment,[4] but the jury found him guilty of both crimes.  At punishment, after Scott pleaded true to a prior felony conviction for delivery of a controlled substance, he faced a possible sentence for each conviction of confinement of fifteen years to life.  The jury imposed sixty years' confinement for each conviction, and this appeal followed.

## III.  Corroborating Evidence

In his first issue, Scott complains that there was no independent corroborating evidence to support the accomplice testimony.

---

[2] 541 U.S. 36, 124 S. Ct. 1354 (2004).

[3] In a reverse drug buy, "[law enforcement] become[s] the seller of the drugs for someone who is looking to buy drugs, which means [law enforcement] basically play[s] the part of a drug dealer, or a confidential informant plays the part [of] a drug dealer."

[4] *See* Tex. Health & Safety Code Ann. § 481.115 (Vernon 2003), § 481.126 (Vernon Supp. 2008).

**A. Standard of Review**

Article 38.14 of the code of criminal procedure provides that

> [a] conviction cannot be had upon the testimony of an accomplice unless corroborated by other evidence tending to connect the defendant with the offense committed; and the corroboration is not sufficient if it merely shows the commission of the offense.

Tex. Code Crim. Proc. Ann. art. 38.14 (Vernon 2005).

When evaluating the sufficiency of corroboration evidence under the accomplice-witness rule, we "eliminate the accomplice testimony from consideration and then examine the remaining portions of the record to see if there is any evidence that tends to connect the accused with the crime." *Malone v. State*, 253 S.W.3d 253, 257 (Tex. Crim. App. 2008) (quoting *Solomon v. State*, 49 S.W.3d 356, 361 (Tex. Crim. App. 2001)). To meet the requirements of the rule, the corroborating evidence need not prove the defendant's guilt beyond a reasonable doubt by itself. *Malone*, 253 S.W.3d at 257; *Trevino v. State*, 991 S.W.2d 849, 851 (Tex. Crim. App. 1999); *Gill v. State*, 873 S.W.2d 45, 48 (Tex. Crim. App. 1994). Nor is it necessary for the corroborating evidence to directly link the accused to the commission of the offense. *Cathey v. State*, 992 S.W.2d 460, 462 (Tex. Crim. App. 1999), *cert. denied*, 528 U.S. 1082 (2000). Rather, the evidence must simply link the accused in some way to the commission of the crime and show that "rational

3

jurors could conclude that this evidence sufficiently tended to connect [the accused] to the offense." *Malone*, 253 S.W.3d at 257 (quoting *Hernandez v. State*, 939 S.W.2d 173, 179 (Tex. Crim. App. 1997)).

There is no set amount of nonaccomplice corroboration evidence that is required for sufficiency purposes; "[e]ach case must be judged on its own facts." *Malone*, 253 S.W.3d at 257 (quoting *Gill*, 873 S.W.2d at 48). Circumstances that are apparently insignificant may constitute sufficient evidence of corroboration. *Trevino*, 991 S.W.2d at 852.

Additionally, "[p]roof that the accused was at or near the scene of the crime at or about the time of its commission, when coupled with other suspicious circumstances, may tend to connect the accused to the crime so as to furnish sufficient corroboration to support a conviction." *Malone*, 253 S.W.3d at 257 (quoting *Brown v. State*, 672 S.W.2d 487, 489 (Tex. Crim. App. 1984)). But "mere presence alone of a defendant at the scene of a crime is insufficient to corroborate accomplice testimony." *Malone*, 253 S.W.3d at 257 (quoting *Golden v. State*, 851 S.W.2d 291, 294 (Tex. Crim. App. 1993)); *Meyers v. State*, 626 S.W.2d 778, 780 (Tex. Crim. App. 1982).

## B.  Non-Accomplice Testimony

Sergeant Jeff Davis of the Denton County Sheriff's Office drug enforcement unit testified that a DEA confidential informant,[5] "Paco," was used to set up a reverse buy for one kilogram of cocaine.  Investigator Norrie met with Paco and equipped him with a recording device.  Investigator Norrie testified that Paco arranged with Edgar Coronado for a drug buy on December 17 or 18, 2007, at a Lewisville Wal-Mart.

Sergeant Davis, the lead investigator, gave the following testimony about the sheriff's office's plan:

> The way we intended for it to happen was we were going to have a meeting between whoever showed up, we knew [at least] Edgar Coronado, and a buyer that we didn't know[,] . . . were probably going to show up.
>
> We instructed [Paco] to direct them to the 24 Hour Fitness there in Lewisville, Texas, to have a meeting and to ensure that the money was correct, the correct count was made.  Once that happened and [Paco] got the word that the count was correct and that the required amount of money was present, they were then going to follow [Paco] over to . . . the Wal-Mart . . . parking lot.
>
> They were going to go to a wall . . . on the east side of the parking lot next to the Sam's store . . . .  At that location[,] there

---

[5] Investigator Shane Norrie of the Denton County Sheriff's Office drug enforcement unit defined a confidential source, or informant, as someone "that assist[s] law enforcement in identifying targets of certain investigations. . . . [I]t's a drug dealer . . . [used] to make buys for intelligence purposes."

would be a kilogram [of cocaine] in the toolbox in the truck parked head in to that wall.

It was our hope . . . that the defendant, or defendants, would pull head in to that wall as well to examine the kilogram. Once they examined the kilogram and they said it looks good, at that point [Paco] was to give a bust signal and we were going to move in and effect the arrest of whoever showed up.

Sergeant Davis testified that Paco contacted Edgar on December 17 and the actual purchase was set up to occur on December 18. He testified that the purchase price for the kilogram of cocaine was $18,500. He testified that he waited at the 24 Hour Fitness in an unmarked Tahoe and saw Paco arrive in his own vehicle, a maroon Ford extended cab pickup, and Edgar arrive in a black Chevrolet pickup truck, followed by a white Volkswagen Jetta driven by Oscar Aguilar-Leiva, with Scott as a passenger. Edgar and Oscar parked next to each other, and Oscar and Scott got out of the Jetta and into Edgar's truck—Oscar in the front passenger's seat and Scott into the driver's side back seat. He then testified,

I saw a greeting amongst the people in the vehicle, and then after a very brief period of time, I saw all of the suspects, Oscar, Edgar, and [Scott], focusing on the center console area of that pickup truck. This took place for I would say five to ten minutes. Everybody's attention in the truck was focused at this center console of the pickup.

Then Paco pulled out of the 24 Hour Fitness parking lot, followed by all three of the suspects in Edgar's pickup truck. Sergeant Davis followed them to the

6

Sam's parking lot and watched Edgar's pickup truck pull head in to the concrete wall "as we planned," a couple of spaces south of the location of the truck with the cocaine, but in the same row. Paco had already parked, a few spaces farther south from Edgar, and Edgar got out of his truck to meet him at the back of Edgar's pickup. They spoke briefly, and then Paco escorted Edgar to the pickup containing the cocaine. Sergeant Davis lost sight of them when they turned in between the trucks. Twelve officers were stationed in the Wal-Mart parking lot.

Scott, Edgar, Oscar, and Paco were arrested. Edgar was arrested next to the toolbox of the truck containing the cocaine; the police found his wallet and some pocket change on him. Oscar was still in Edgar's truck and had $1,001 on him; two cell phones were found in his seat. Scott was still in the back seat of Edgar's truck, and a McDonald's sack containing $18,460 was discovered at his feet. He had $538 and a cell phone on his person, $115 in his wallet, and an empty blue zipper bag stuffed into his waistband. Two additional cell phones were recovered near his seat.[6] Sergeant Davis testified that Scott told the police that he was just along for the ride to get some auto parts and denied that the cell phones found next to him were his. He also

---

[6] The police located a fifth cell phone, belonging to Edgar, in the front center console.

7

testified that he believed that Scott was "the money man" in the reverse buy. Two McDonald's burritos were found on the center console of Oscar's Jetta.

Patrick LeMaire, of the Denton County Sheriff's Office forensics department, testified that he took photos of the information from a cell phone found in the front passenger seat of Edgar's truck. These photographs were admitted into evidence and reveal calls made either to or from two individuals: six calls to or from "Cuz," at 903-449-7026, between 2:32 p.m. and 6:16 p.m. on December 17; two calls to or from Edgar between 6:25 p.m. and 6:35 p.m. on December 17; one call to or from Edgar at 8:12 a.m. on December 18; five calls to or from "Cuz" between 8:42 a.m. and 9:49 a.m. on December 18; and two calls to or from Edgar at 9:52 a.m. and 9:58 a.m. on December 18. The phone number of one of the cell phones from the back seat is 903-449-7026 and has the user name "rickeymarinez@myboostmobile.sprintpcs.com."

Scott's sister testified on his behalf during Scott's case-in-chief. She testified that he is a thirty-three-year-old barber who lives in Commerce, Texas, and she recognized his blue money pouch from the photo of Scott taken at the scene. She testified that Scott used his mother's car to drive to Dallas on December 18, 2007, and that the area code for Commerce, Texas, is 903.

## C. Accomplice Testimony

Oscar testified that he was a codefendant in this case and had pleaded guilty and agreed to testify against Scott in exchange for seven years' deferred adjudication community supervision. He testified that he lived in Dallas, that Scott had a barbershop in Commerce, Texas, that he met Scott last year "through a cousin of his," and that he was also friends with Edgar. He testified that he has two cell phones and that the cell phone found in the front passenger seat of Edgar's truck, with the calls to or from Edgar and "Cuz," was his. Attributing his lack of memory to a bad hangover that he apparently suffered on December 18, 2007, he gave the following testimony about the "Cuz" with phone number 903-449-7026:

Q. Who is Cuz?

A. I had like two different Cuz, and I don't recognize the numbers. I just go by, you know, what I have it saved as.

Q. Who is Cuz?

A. One of them was—I think one of them was [Scott]. The other one—like I said, I have different Cuz.

Q. Is this Robert Scott's phone number?

A. I don't know about the phone number. Like I said, I remember the nicknames that I have them saved as, you know. . . .

9

He also stated that he knew more than one Edgar and that he could not tell whether the calls were incoming or outgoing.

Oscar testified that on the morning of December 18, 2007, Edgar came to his house and woke him up, and they went to breakfast at McDonald's. He followed Edgar's truck in his white Volkswagen Jetta. Scott called him and met them at the McDonald's. Oscar testified that he took Scott and Oscar's McDonald's burritos with him in his Jetta and followed Edgar's truck to Lewisville. Once there, they got into Edgar's truck, and Edgar spoke on his cell phone in Spanish to someone.

Oscar testified that Scott became involved in the drug purchase because Edgar had approached him and asked him for $18,000. During Oscar's testimony, the trial court granted the State permission to treat Oscar as a hostile witness. Much of Oscar's testimony was given in the following manner:

> Q. At this point in time [at the 24 Hour Fitness], all three of you are aware of what you're there for; is that correct?
>
> A. I mean, I have an idea, yeah.
>
> Q. And that's to buy a kilogram of cocaine; is that correct?
>
> A. Well, [Edgar] was talking to this guy in Spanish, and, you know, he never mentioned anything about that. He just said, you know, follow me so he can go and check this out. But, I mean, I believed, you know—I know he was doing something that, you know . . . .

10

Q. Oscar, isn't it true that when you were asked in your plea bargain agreement testimony under oath you were asked the question, isn't it true that when you all went there, you, [Edgar,] and Scott, everybody there knew — at least all three of you all knew that you were all there to buy cocaine; is that correct?

A. Well, I think I knew that, and I believe, you know, everybody else knew.  Yes, that's correct.

He also testified that Edgar was the only person who talked about buying cocaine and knew all of the specifics, that Edgar counted the money and put it in a McDonald's bag, and that Scott did not know the specifics of the transaction.

Edgar testified that he was a codefendant in the case, that he had been charged with attempting to possess cocaine, and that he had not been offered a plea bargain.  He testified that he met Paco through a mutual friend, that he had known him for around a week and a half before the drug transaction, and that he had tried to find a customer for Paco for a kilo of cocaine.  He testified that he did not buy it because he did not have the money and because he had "never messed with drugs."  He had known Oscar since August 2007, and Oscar had asked him if he knew anybody who had a kilo of cocaine for someone who wanted to buy it.

Edgar testified that he had a conversation with Paco on the morning of December 18, 2007, and then called Oscar and set up the deal.  He

11

acknowledged that it was his voice and Paco's voice on the recording made by Investigator Norrie on December 17, 2007, and that the nature of their conversation was for the purchase of a kilo of cocaine. The trial court admitted the recording and it was published to the jury.

He testified that he and Oscar went to a nearby McDonald's and met Scott, who had the money and who was supposed to be the buyer. He testified that Oscar did not have a hangover that day.

Edgar drove to Lewisville in his dad's truck, a Chevy Silverado, and Oscar and Scott followed him in Oscar's white Volkswagen Jetta. When they arrived at 24 Hour Fitness, he called Paco, and Oscar and Scott hopped in Edgar's truck—Oscar in the front passenger seat and Scott in the back seat. He testified that although Paco had told them to count the money, he did not think anyone counted it, or that they started to, "but there was a lot so we just left it." Scott had taken the money from a leather bag and gave it to Edgar; then Scott put it in a McDonald's bag and kept it in the back seat, and they drove across the street to a Wal-Mart. Edgar stepped out of his truck; he did not get a good look at the tool box before "a lot" of police arrived and arrested them.

Edgar testified that he was employed selling car parts and that his father was disabled. He testified that this was his first drug deal and that he set it up because "[w]e were doing bad at home, and I just wanted to, you know, make

12

a good Christmas for my family." He was supposed to receive $1,000 for his efforts.

## D. Analysis

Scott complains that there is no fingerprint evidence, no DNA evidence, and no videotape or audiotape evidence to link him to the crimes and that his "mere presence" is insufficient for corroboration. However, the following shows more than mere presence at the scene and corroborates Edgar's and Oscar's testimonies: (1) as a result of the phone calls between Paco and Edgar, Sergeant Davis was expecting a buyer other than Edgar; (2) Edgar drove alone to the 24 Hour Fitness and Oscar and Scott followed him in another vehicle; (3) Scott and Oscar got into Edgar's truck and, for over five minutes, they did something that involved leaning over the truck's center console; (4) the three men followed Paco to the Wal-Mart parking lot and parked near the truck containing the cocaine; (5) at the time of the bust, Edgar and Oscar carried less than $1,100 together; (6) Scott had an empty bank money bag stuck in his waistband, and his area code was "903," the same as that listed for "Cuz" on Oscar's cell phone; (7) Scott had $18,460 in a McDonald's bag at his feet and an additional $653 on him; and (8) the price for the kilo of cocaine was $18,500.

Based on our own review of the foregoing non-accomplice evidence, we conclude that there is "evidence that tends to connect the accused with the crime," i.e., that links Scott in some way to the commission of the crimes, and that "rational jurors could conclude that this evidence sufficiently tended to connect [Scott] to the offense[s]." *See Malone*, 253 S.W.3d at 257. Therefore, we overrule Scott's first issue.

## IV. Extraneous Acts

In his second issue, Scott asserts that the trial court erred during the punishment phase of trial by admitting testimony of extraneous acts for which he had not been convicted.

### A. Background

Scott's complaint is that, during the punishment phase, Sergeant Danny Powell testified that while he attempted to execute a search warrant at Scott's home, Scott arrived, saw the officers, rapidly backed his car out, and almost hit Powell, who had to dive into a ditch. Another investigator, who witnessed the incident and fired two shots into Scott's car's tires, corroborated Sergeant Powell's testimony. Pursuant to the search warrant, the police seized drugs at Scott's residence. The trial court considered the testimony and Scott's objections based on *Blakely v. Washington*, 542 U.S. 296, 124 S. Ct. 2531 (2004), outside the jury's presence and then overruled them. The trial court

14

granted Scott a running objection before the testimony was presented to the jury.

## B. Analysis

Scott asserts that

> The testimony of extraneous acts of purported drug possession and attempted killing of an officer were used the [sic] enhance punishment during the punishment phase of the trial. These acts were never tried to a jury nor admitted to by the defendant. In *Blakely*, extraneous acts that had never been tried to a jury nor admitted to by the defendant were used in the punishment phase; the Supreme Court reversed because the defendant's right to a jury trial had been violated. . . . Likewise, this court should reverse the appellant's sentence for violation of his sixth amendment right to a jury trial.

However, in *Barrow v. State*, the court of criminal appeals set forth the following analysis:

> The Supreme Court determined in *Apprendi v. New Jersey* that "[o]ther than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt." As Justice Scalia later explained for the Supreme Court in *Blakely v. Washington*, the statutory maximum in this context means the "maximum sentence a judge may impose *solely on the basis of the facts reflected in the jury verdict or admitted by the defendant*." Thus, the *Apprendi* line of cases requires that, in any case in which the defendant has elected to exercise his Sixth Amendment right to a jury trial, any discrete finding of fact that has the effect of increasing the maximum punishment that can be assessed must be made by the jury, even if that fact-finding occurs as part of the punishment determination.

15

The appellant relies on this determination by *Apprendi* and its progeny that *a sentence* cannot be greater than that authorized by the jury's fact-finding. But these cases hold that a trial court is prohibited from unilaterally increasing *individual* sentences on the basis of facts that were not resolved by the jury. Thus, *Apprendi* and its progeny clearly deal with the upper-end extension of individual sentences, when that extension is contingent upon findings of fact that were never submitted to the jury.

207 S.W.3d 377, 379 (Tex. Crim. App. 2006) (internal citations omitted).

First, the trial court's evidentiary rulings are reviewed under the abuse of discretion standard; that is, we will uphold the rulings where the evidence is supported by the record and where the ruling is correct under a theory of law. *Ramos v. State*, 245 S.W.3d 410, 417–18 (Tex. Crim. App. 2008). Second, we note that Scott's reliance on *Blakely* is off the mark because the Supreme Court in that case cited with approval its prior ruling in *Apprendi v. New Jersey*, 530 U.S. 466, 490, 120 S. Ct. 2348, 2362–63 (2000), and as recounted in *Barrow* above, "[o]ther than the fact of [another] conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt." 207 S.W.3d at 379. Third, section 3(a)(1) of article 37.07 of the code of criminal procedure states,

Regardless of the plea and whether the punishment be assessed by the judge or the jury, *evidence may be offered by the state and the defendant as to any matter the court deems relevant to sentencing*, including but not limited to the prior criminal record of the

16

defendant, whis general reputation, his character, an opinion regarding his character, the circumstances of the offense for which he is being tried, and, notwithstanding Rules 404 and 405, Texas Rules of Evidence, *any other evidence of an extraneous crime or bad act that is shown beyond a reasonable doubt by evidence to have been committed by the defendant or for which he could be held criminally responsible, regardless of whether he has previously been charged with or finally convicted of the crime or act.*

*See* Tex. Code Crim. Proc. Ann. art. 37.07, § 3(a)(1) (Vernon Supp. 2008) (emphasis added).

In the case before us, the jury, and not the judge, set punishment within the statutory range, the basis of which included an instruction that the complained-of allegations against Scott had to be proven beyond a reasonable doubt. *See id.* Hence, *Blakely* is inapplicable to Scott's second issue, and we cannot say that the trial court abused its discretion. *See Ramos,* 245 S.W.3d at 417–18. We overrule Scott's second issue.

### V. Hearsay

In his final issue, Scott complains that Paco's hearsay statements made during Edgar's testimony were admitted in contravention of his right to confront witnesses under *Crawford v. Washington*.

Preservation of error is a systemic requirement that this court should review on its own motion. *Archie v. State,* 221 S.W.3d 695, 698 (Tex. Crim. App. 2007); *Jones v. State,* 942 S.W.2d 1, 2 n.1 (Tex. Crim. App. 1997). To

17

preserve a complaint for our review, a party must have presented to the trial court a timely request, objection, or motion that states the specific grounds for the desired ruling if they are not apparent from the context of the request, objection, or motion. Tex. R. App. P. 33.1(a)(1); *Mosley v. State*, 983 S.W.2d 249, 265 (Tex. Crim. App. 1998) (op. on reh'g), *cert. denied,* 526 U.S. 1070 (1999). Further, the trial court must have ruled on the request, objection, or motion, either expressly or implicitly, or the complaining party must have objected to the trial court's refusal to rule. Tex. R. App. P. 33.1(a)(2); *Mendez v. State*, 138 S.W.3d 334, 341 (Tex. Crim. App. 2004). The complaint made on appeal must comport with the complaint made in the trial court or the error is forfeited. *See* Tex. R. App. P. 33.1; *Heidelberg v. State*, 144 S.W.3d 535, 537 (Tex. Crim. App. 2004). "An objection on hearsay does not preserve error on Confrontation Clause grounds." *Reyna v. State*, 168 S.W.3d 173, 179 (Tex. Crim. App. 2005). Scott objected only on the basis of hearsay at trial.

18

Therefore, he has preserved nothing for our review.[7] *See id.* We overrule

Scott's third issue.

---

[7] Furthermore, two of Scott's hearsay objections were sustained, but he requested no further relief, so these complaints would have been forfeited even if he had presented his Confrontation Clause argument to the trial court. *See Cruz v. State*, 225 S.W.3d 546, 548 (Tex. Crim. App. 2007) (stating that the only essential requirement to ensure preservation is a timely, specific request that is *refused* by the trial court); *Brooks v. State*, 642 S.W.2d 791, 798 (Tex. Crim. App. [Panel Op.] 1982); *see also Henderson v. State*, 617 S.W.2d 697, 698 (Tex. Crim. App. [Panel Op.] 1981) (stating that appellant's failure to request any further relief after his objection was sustained preserves nothing for review); *Parrish v. State*, 950 S.W.2d 720, 724 (Tex. App.—Fort Worth 1997, no pet.) (holding that appellant forfeited his hearsay complaint when he failed to request a mistrial after his objection was sustained and an instruction to disregard given).

And regarding Scott's other two hearsay objections, he failed to object to the same evidence that came in before or after his objections were made, so these complaints also would have been forfeited even if he had presented his Confrontation Clause argument to the trial court. *See Fuentes v. State*, 991 S.W.2d 267, 273 (Tex. Crim. App.) (stating that a party must continue to object each time the objectionable evidence is offered), *cert. denied,* 528 U.S. 1026 (1999); *Leday v. State*, 983 S.W.2d 713, 718 (Tex. Crim. App. 1998) (observing that a trial court's erroneous admission of evidence will not require reversal when other such evidence was received without objection, either before or after the complained-of ruling).

## VI.  Conclusion

Having overruled all of Scott's issues, we affirm the trial court's judgment.

BOB MCCOY
JUSTICE

PANEL: CAYCE, C.J.; MCCOY and MEIER, JJ.

DO NOT PUBLISH
Tex. R. App. P. 47.2(b)

DELIVERED: April 23, 2009